Filed 8/18/14  In re Allison P. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re ALLISON P., a Person Coming Under the Juvenile Court Law. | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>MARLENE G.,<br><br>        Defendant and Appellant. | B253515<br>(Los Angeles County<br>Super. Ct. No. DK00210) |

APPEAL from orders of the Superior Court of Los Angeles County, Robert S. Draper, Judge.  Affirmed.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

Marlene G., mother of Allison P. (Mother), appeals the juvenile court's jurisdictional and dispositional orders. The court asserted jurisdiction over Allison pursuant to Welfare and Institutions Code section 300, subdivision (c).[1] Mother contends substantial evidence does not support the court's finding that the child was suffering serious emotional damage or at risk of suffering serious emotional damage or its finding that she coached the child to falsely accuse her stepmother of physical abuse. Mother further contends that the court abused its discretion in terminating jurisdiction under section 364 without providing family reunification services. We conclude substantial evidence supported the court's findings and that the court did not abuse its discretion in terminating jurisdiction and issuing an exit order.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Detention*

Per a family court order, Allison resided with Father and her stepmother Ashley, and had visitation with Mother on weekends. One weekend in July 2013, when Allison was five, Mother took her to a police station, where the girl reported that Ashley had hit her on the thigh with a closed fist. There was bruising on the girl's outer thigh, but it did not appear to be the result of having been punched. The officers called the Department of Children and Family Services (DCFS).

Allison told the caseworker that Mother wanted to obtain custody of her and that Mother had advised her to tell the officers "that Ashley hit me." The girl initially told the caseworker that Ashley hit her with a closed fist and that she was "scared" of Ashley. As the interview continued, however, Allison stated she was not afraid of Ashley, but was "sometimes" afraid of Mother. By the end of the

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

interview, Allison said to the caseworker, and to a police officer who was present, that "my mommy tells me . . . ['don't get close to Ashley . . . she is evil'] . . . Ashley [doesn't hit me] . . . [but my mommy tells me that she does.]" (Translated from Spanish.) Ashley further stated that the bruising on her leg was from having been bitten by a young male relative.[2] Ashley was later taken to a hospital to be interviewed, and told the nurse practitioner that although Mother told her to say Ashley hit her, she had actually been bitten by her young uncle. She denied physical abuse by any parent.

Mother told the caseworker that Father had been physically abusive when they were together. She said that she was afraid Father and Ashley would "murder" Allison. She denied coaching Allison, but said she would cooperate with DCFS only if the girl was returned to her.

When Father and Ashley arrived at the police station, Allison did not appear to be afraid of either of them. Father admitted he and Mother had been involved in domestic altercations and had used drugs when they were together, years earlier. Since they were apart, Mother had been arrested and deported after sustaining a burglary conviction. Father denied any abuse in his current relationship or any current drug use.[3]

Regarding Allison, Father stated that she "started changing" in April 2013, when she began having visits with Mother. When Allison returned from visits with Mother, she behaved aggressively and had begun to steal. Father was attempting to obtain counseling services for her and had scheduled an intake appointment for the following Monday. Ashley denied having hit Allison and said she had a positive relationship with her stepdaughter.

---

[2] Allison said "cousin," but the boy in question was elsewhere described as the six-year-old child of her paternal grandmother and was, therefore, her uncle.

[3] Both Father and Mother submitted to on demand drug tests, which were negative.

Further investigation revealed that Mother had taken Allison to the police station to make a similar report in April 2013. According to the report, the girl stated that one month earlier, Ashley had hit her with a tube of some type, but "could not give further detail." Mother reported there had been a small bruise near her pubic bone, but a female police officer who examined the child did not see it. Mother said she had been afraid to report the incident because of her immigration status. The caseworker told her she should report abuse in a more timely fashion, but not "any bruise or scratch." Father and Ashley were interviewed in connection with this report, denied the allegation, and stated that Mother had been attempting to regain custody of Allison and was encouraging the girl to make false accusations.

The caseworker concluded that the parents' custody battle and Mother's coaching was causing the child emotional distress. She learned that Allison's teacher had expressed concern about the "emotional splitting" that Allison had been experiencing.[4] She attempted to discuss voluntary services, but Mother was angry and uncooperative. At the July 31, 2013 detention hearing, the court found a prima facie case for detaining Allison from Mother and released the girl to Father's care.[5]

B. *Jurisdiction*

Re-interviewed for the jurisdictional report, Father stated that when Mother returned after being deported, she told him she wanted Allison back in her care and

---

[4] Allison later stated that Mother had fought with Ashley at school, "screaming really loud [at] Ashley."

[5] Mother also has an infant daughter, who lives with her, and a year-old son, who lives with his maternal grandmother. The daughter's alleged father was incarcerated and his release date was unknown. The boy's father's whereabouts were unknown. Neither child was detained, and neither is a subject of this appeal.

also wanted the $400 per month Father previously provided. Father stated that Allison's March 2013 injury was attributable to tripping over his weights or falling while riding her bicycle. He believed the more recent injury happened when she was visiting her paternal grandmother and playing with the grandmother's young son. Ashley was interviewed and attributed Allison's injuries to the same causes identified by Father. Father said Allison had begun to steal and lie and that she cried a lot. Ashley stated the girl cried for 20 minutes after visits with Mother but could not articulate why. The girl told Ashley that Mother told her not to pay attention to Father or Ashley, and that Ashley was going to jail. Ashley also believed Mother complained about financial problems to the girl.

Mother was re-interviewed and again denied coaching Allison. Mother reiterated that Father had used drugs when they were together, and said he had forced drugs on her.

Allison repeated that she had been bitten by her young uncle. She said that when she told Mother, Mother accused her of lying and said that Ashley had hit her. Allison repeated that Mother told her to "say things" about Ashley. She said she wanted to continue to live with Father and Ashley. At the time of the jurisdictional report, Allison was receiving individual counseling and school-based therapy.

At the December 2013 jurisdictional hearing, counsel for DCFS and counsel for Allison urged the court to sustain the petition and assume jurisdiction over the child under section 300, subdivision (c). The court noted Allison's repeated statements that "Mother has consistently coached her to lie; [and] that [Mother] called her a liar when she wouldn't lie about the events." The court found true that Mother "placed [Allison] in a detrimental and endangering situation and emotionally abused the child by attempting to force [her] to make false allegations of being physically abused in [Father's] home by [Ashley]," and that Mother's

5

"relentless pressure on the child to give false and misleading statements of the physical abuse of the child by [Ashley] resulted in the child exhibiting emotional distress requiring psychological therapeutic intervention" and "place[d] the child at substantial risk of suffering serious emotional damage as evidenced by severe anxiety, and depression."

At the hearing, the court explained its finding that Mother engaged in the alleged behavior by observing that Allison had consistently said she had been coached to lie by Mother. The court further explained that although Allison was not "presently exhibiting extreme emotional distress or psychological problems," she was exhibiting "plenty of symptoms" to indicate she would exhibit such problems in the future if Mother's conduct continued.

Turning to disposition, the court concluded that continued assertion of jurisdiction was not necessary. The minor's counsel argued that jurisdiction should continue so Allison and her parents could receive therapy. Mother's counsel also argued in favor of continued jurisdiction. The court stated: "Well, if the child is already enrolled in individual counseling, I'm not really sure what counseling the parents can go through that would assist in the problem." The court terminated jurisdiction and issued an exit order limiting Mother to monitored visits. Mother appealed.

## DISCUSSION

A. *Jurisdiction*

"'The petitioner in a dependency proceeding must prove by a preponderance of the evidence that the child who is the subject of a petition comes under the juvenile court's jurisdiction.'" (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1379, quoting *In re Amy M.* (1991) 232 Cal.App.3d 849, 859.) On appeal from a jurisdictional order, "we must uphold the court's findings unless, after reviewing

6

the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings." (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185.)

Here, the court's jurisdictional finding was under section 300, subdivision (c), which states that a child who comes within the following description is within the jurisdiction of the juvenile court and may be adjudged a dependent: "The child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian . . . ." To prove that a child comes within the statutory definition of a dependent child under section 300, subdivision (c), DCFS bears the burden of establishing the following three elements: (1) serious emotional damage as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior or a substantial risk of severe emotional harm if jurisdiction is not assumed; (2) offending parental conduct; and (3) causation. (See *In re Alexander K.* (1993) 14 Cal.App.4th 549, 557.)

The court concluded that Allison was not yet suffering serious emotional damage, but was at substantial risk of suffering such damage as the result of Mother's behavior. The finding was supported by substantial evidence. Ashley and Father reported that Allison cried for lengthy periods after visits with Mother, indicating severe anxiety or depression. Father also reported that she had begun behaving aggressively and stealing. Her teacher had also observed that Allison was experiencing "emotional splitting." Father was so alarmed by the child's current mental and emotional state that he had scheduled an intake appointment for counseling services prior to DCFS's involvement. By the date of the jurisdictional hearing, Allison was in therapy and seeing a school counselor. On this record, the

7

court could reasonably find that the requirements of subdivision (c) of section 300 had been met.

Mother alternatively contends that the evidence was not clear that she coached Allison to make false accusations against Ashley. "We review a cold record and, unlike a trial court, have no opportunity to observe the appearance and demeanor of the witnesses." (*In re Sheila B*. (1993) 19 Cal.App.4th 187, 199.) Accordingly, "we must defer to the trial court's factual assessments." (*In re Luke M*. (2003) 107 Cal.App.4th 1412, 1427.) "When an appellate court reviews a sufficiency of the evidence challenge, we may look only at whether there is any evidence, contradicted or uncontradicted, which would support the trier of fact's conclusion. We must resolve all conflicts in favor of the court's determination, and indulge all legitimate inferences to uphold the court's order. Additionally, we may not substitute our deductions for those of the trier of fact." (*In re John V*. (1992) 5 Cal.App.4th 1201, 1212.) Allison told the caseworker, a police officer, and a hospital worker that she had been coached by Mother to make false accusations. Father reported that Mother had a motive to encourage Allison to make false accusations so she could regain custody and the financial benefits that followed. Although Mother disputed these facts, the evidence was sufficient to support the court's finding.

B. *Disposition*

After finding that a child is a person described in section 300 and therefore the proper subject of dependency jurisdiction, the court must determine "the proper disposition to be made of the child." (§ 358, subd. (a).) Section 364 governs situations such as the present one, in which "an order is made placing a child under the supervision of the juvenile court pursuant to Section 300 and . . . the child is not removed from the physical custody of his or her parent or guardian . . . ."

(§ 364, subd. (a).)  After a finding that grounds exist to support assertion of jurisdiction but that detention from the custodial parent is not required, a juvenile court has discretion under section 364 to provide reunification services to either or both parents -- or it may "bypass the provision of services and terminate jurisdiction." (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 650-651; see also *In re Pedro Z.* (2010) 190 Cal.App.4th 12, 20.)[6]  The court has "broad discretion" to determine which of these options would "serve the child's best interests" (*In re Gabriel L.*, *supra*, at p. 652) after considering "the totality of the child's circumstances." (*In re Alexandria M.* (2007) 156 Cal.App.4th 1088, 1095.)  "The reviewing court will not reverse the court's order in the absence of a clear abuse of discretion.  [Citation.]" (*In re Gabriel L.*, *supra*, 172 Cal.App.4th at p. 652.)

The juvenile court concluded that because Allison was already enrolled in ongoing therapy, there was no reason to continue jurisdiction.  Mother contends the parents would have benefitted from programs such as Parents Beyond Conflict, parenting classes, or conjoint therapy to assist them with conflicts over parenting issues.  Assertion of jurisdiction was not based on conflicts between Mother and Father over parenting issues or Allison's inability to adjust to the divorce, but on Mother's deliberate misbehavior in coaching Allison to falsely accuse Ashley so she could regain custody and obtain financial benefits.  Mother did not need therapy to realize that her behavior was wrong.  The court was not required to resolve all the family's problems, but only the conduct that led to assertion of

---

[6]     "When the juvenile court terminates its jurisdiction over a dependent child, section 362.4 authorizes it to make custody and visitation orders that will be transferred to an existing family court file . . . ." (*In re Roger S.* (1992) 4 Cal.App.4th 25, 30.)  "'Such orders become part of any family court proceeding concerning the same child and will remain in effect until they are terminated or modified by the family court.  [Citation.]'" (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1123.)

jurisdiction. By placing primary custody with Father and limiting Mother to monitored visitation, the court's jurisdictional concerns were addressed.

## DISPOSITION

The jurisdictional and dispositional orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, J.

We concur:

WILLHITE, Acting P. J.

EDMON, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.